# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TAYR KILAAB AL GHASHIYAH
(KHAN),

                    Plaintiff,

v.

MARK KARTMAN, ANGELA BUSS,
TARA FREDLUND, LYNN
WASHETAS, JODIE BELOUNGY,
NEVIN WEBSTER, VICKIE REISEN,
KATHRYN GYR, JASON JACKSON,
and JANE DOE,

                    Defendants.

Case No. 21-CV-1479-JPS

**ORDER**

On December 29, 2021, various defendants removed this case from
Kenosha County Circuit Court pursuant to 28 U.S.C. §§ 1441, 1446. ECF No.
1. On August 29, 2023, the Court granted Defendants' partial motion to
dismiss. ECF No. 33. In doing so, the Court clarified that it viewed the
following claims remaining in the case: (1) Buss declined to process forms
on December 1, 2017, because they did not include the Plaintiff's
incarcerated name, ECF No. 1-1 ¶ 137; (2) Kartman declined to process an
internal correspondence on December 18, 2017, because it did not include
the incarcerated name, *Id.* ¶ 138; (3) Beloungy, on January 30 – February 15,
2018, denied Plaintiff from filing a grievance based on cross-reference issue
with Plaintiff's name, *Id.* ¶¶ 141–44; (4) Fredlund, on February 15, 2018,

refused and returned Plaintiff's grievances unfiled, *Id.* ¶ 145; (5) Washetas,[1] on February 9, 2018, declined to process and provide notary service because of the legal name issue, *Id.* ¶ 146; (6) Jackson, on March 30, 2018, declined to process money disbursement form for legal postage to the courts and three legal loan application forms because Plaintiff's legal/religious name appeared on the forms, *Id.* ¶¶ 148, 151; (7) Jackson, on April 2, 2018, indicated to Plaintiff that when filling out legal loan application or using legal loan funds he must include the name "John Casteel," *Id.* ¶ 156; (8) Jackson, on April 3, 2018, declined to process three legal loan applications, and disbursement forms for legal postage, because of the name provided, *Id.* ¶¶ 160–62; (9) Webster, on March 30, 2018, declined to process an E-file request to the Western District Court, stating "Please resubmit your DOC-643 properly completed including your DOC name and no toothpaste[,]" *Id.* ¶ 149; (10) Webster, on April 2, 2018, responded to an interview request asking Plaintiff to use his appropriate DOC name, stating he could not find anyone named "Tayr Kilaab al Ghashiyah" on the WCI/DOC Locator, *Id.* ¶ 154; (11) Webster, on April 2, 2018, declined to process Plaintiff's law library request because his legal/religious name appeared on the forms, *Id.* ¶ 155; (12) Webster, on April 2, 2018, declined to process E-file requests to the federal court because he could not find anyone named "Tayr Kilaab al Ghashiyah" on the WCI/DOC locator, *Id.* ¶ 157; (13) Reisen, on April 2, 2018, declined to process formal grievance forms to the warden's office because Plaintiff did not use his DAI inmate name, *Id.*

---

[1] Plaintiff's complaint spells this defendant's name as "Walhetas." ECF No. 1-1 ¶ 146. Defendants' notice of appearance, however, lists an appearance for Defendant "Lynn Washetas." ECF No. 4. The Court will therefore use Defendants' spelling of the name.

¶ 159; (14) Gyr, on April 3, 2018: denied notary services stating, "I cannot read your DOC # nor find you in the system under that name. Please resubmit with a legible DOC # & your correct name for DOC[,]" *Id.* ¶ 163; (15) Reisen, on April 4, 2018, declined to process Plaintiff's formal grievance forms to the warden's office by stating, "Your correspondence is being returned to you since you failed to use your DAI inmate name per information received form the records office[,]" *Id.* ¶ 164; (16) Jane Doe, on January 30, 2017, declined to process Plaintiff's library material request because Plaintiff's dual names appeared on the forms, *Id.* ¶ 131; (17) Jane Doe, on May 6, 2017, declined to process Plaintiff's library material request because Plaintiff's dual names appeared on the forms, *Id.* ¶ 132; and (18) Jane Doe, on May 21, 2017, declined to process Plaintiff's library material request because Plaintiff's dual names appeared on the forms, *Id.* ¶ 133. ECF No. 33 at 26-28.[2]

As a preliminary matter, the Court will dismiss the Doe defendants for Plaintiff's failure to timely identify them. The Court gave Plaintiff until October 30, 2023, to identify the Doe defendants. *Id.* at 26. The Court warned Plaintiff that the failure to comply with that deadline would result in the dismissal of those claims without further notice. *Id.* That deadline has long passed, and Plaintiff has failed to comply with the Court's order. As such, all claims against the Doe defendants will be dismissed without prejudice for Plaintiff's failure to comply with the Court's order.

---

[2]Plaintiff's opposition brief largely focuses on two claims that the Court did not find could proceed—whether the DOC policy was properly promulgated and whether discretionary immunity applied to state law claims. *See* ECF No. 54. The Court does not engage in these arguments because it specifically found that Plaintiff failed to plead factual allegations that were sufficient to plead state law claims. ECF No. 33 at 14.

Now pending before the Court is Defendants' motion for summary judgment, filed on April 15, 2024. ECF No. 49. On April 30, 2024, Plaintiff filed his opposition. ECF No. 54. On May 14, 2024, Defendants filed a reply brief. ECF No. 56. As described below, the Court will grant Defendants' motion for summary judgment and this case will be dismissed.

1.    **LEGAL STANDARD – SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

2.    **FACTUAL BACKGROUND**

Along with their summary judgment motion, Defendants submitted proposed findings of fact ("DPFF"). ECF No. 51. Plaintiff failed to respond to any of Defendants' proposed facts. As such, the Court finds Defendants' facts to be undisputed for the purposes of summary judgment. *See* Fed. R.

Civ. P. 56(e)(2).[3] Thus, the following facts are taken directly from Defendants' proposed findings of fact with only minor edits for grammar and formatting.

## 2.1 Plaintiff's Name Change

Plaintiff was incarcerated in Wisconsin Department of Corrections ("DOC") prisons from 1981 until 2021. He is currently on parole. Plaintiff's legal name, given at birth was John Alberto Casteel. Plaintiff's Judgments of Conviction ("JOC") that served the basis for his incarceration identify him as John Casteel. Plaintiff has not taken any steps to have the name on his JOCs changed.

Prior to prison, Plaintiff was Catholic. He became Mormon in 1981. In 1987, after he was excommunicated from being Mormon, Plaintiff started practicing Islam. In 1988, with help from his spiritual advisor at the time, Plaintiff took on a new name: Tayr Kilaab al Ghashiyah Khan. Plaintiff testified that taking a new name is recommended, but not required, by his Islamic religion. The name is Arabic, and translates to "Birddog, the overwhelming event."

---

[3]The Court notes that Plaintiff did file a sworn affidavit along with his opposition materials. *See* ECF No. 55. In many pro se cases, and as allowed by circuit precedent, the Court looks to sworn affidavits as evidence for the purposes of summary judgment and determining if there are genuine disputes of fact. *See Jones v. Van Lanen*, 27 F.4th 1280, 1285–86 (7th Cir. 2022) ("[T]he law allows verified complaints—containing not just allegations but sworn statements of fact—to serve as evidence for purposes of summary judgment."). In this case, however, the Court declines to do so because Plaintiff's affidavit is eighteen pages long, single spaced, and filled with irrelevant facts and legalese. *See, e.g.*, ECF No. 55 at 3 (discussing the Model Penal Code's definition of kidnapping). While the Court has generally reviewed Plaintiff's affidavit and attempted to locate support for his allegations, "judges and adverse parties need not try to fish a gold coin from a bucket of mud." *See U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003).

Plaintiff petitioned the Brown County Court, pursuant to Wis. Stat. § 786.36, to change his name from John A. Casteel to Tayr Kilaab al Ghashiyah Khan. The circuit court signed an Order For Change of Name, on April 22,1988, stating that Plaintiff's name "is changed to the Arabic name of Tayr Kilaab al Ghashiyah Khan, based on his Islamic beliefs, teaching and tenets of the Ismailis Sect of America."

## 2.2    DOC's Name Policies

DOC's policies with respect to how inmates are permitted to identify themselves have changed over the years. On March 28, 2000, the DOC adopted a "dual name policy" under which Plaintiff could use his Muslim name internally and on outgoing mail, as long as he also used the JOC name, i.e., "Tayr Kilaab al Ghashiyah – Casteel, #80584." On April 18, 2005, while Plaintiff was incarcerated at Waupun Correctional Institution ("WCI"), DOC informed Plaintiff that he could start to use his Muslim name without referencing his JOC name for mail, visits, and business purposes, including notary and financial. DOC provided the rationale for this change in a memo written by Pamela Fuller, WCI Offender Records Supervisor. Fuller wrote that after 2000, DOC had begun allowing other inmates to use their new legal names without referring to their former names, instead relying on a posted cross-reference.

Thus, the cross-reference was established for Plaintiff: "CASTEEL, John aka: al GHASHIYAH, Tayr Kilaab." On January 25, 2007, Plaintiff was transferred from WCI to Wisconsin Secure Program Facility ("WSPF"). On February 7, 2007, Ms. Alderson, WSPF Records Supervisor, issued a memorandum to Plaintiff informing him that he now needed to use his JOC name and DOC number as well for receiving and sending mail, visits, and legal transactions such as notary. She wrote,

The proper use of your Judgment of Conviction (JOC) name and your new legal name has been reviewed. It has been determined that you will be allowed to use your legal name change with the stipulation that you also need to use your JOC name of Casteel and your DOC number as indicated below (for receiving and sending mail, visits, legal transactions, such as notary and for business purposes):

TAYR Kilaab al Ghashiyah – John casteel #080584

The staff at WSPF has been informed of the proper use of your name(s).

Shortly thereafter, the practice was updated to allow Plaintiff to send outgoing correspondence using just his new legal name. But on internal correspondences Plaintiff still had to include his JOC name as well. On February 22, 2007, Ms. Alderson wrote Plaintiff to inform him:

Effective 2/22/07, per Department of Justice ("DOJ") you are allowed to use only your legally changed name, along with your DOC number, on any mail going in or out of WSPF.

However, for any correspondence within the institution, you will still be required to use your incarcerated name, along with your legally changed name and your DOC number.

Plaintiff received a copy of the February 22, 2007 memo and understood it. Pursuant to Wis. Admin. Code § DOC 303.31(2) (Register Sept. 2014), an inmate is not allowed to use a name "other than the name by which the inmate was committed to the department unless the name was legally changed." In other words, an inmate who has had his name legally changed may use the new name. However, the code provision is silent as to whether the inmate must also reference his JOC name on documents.

In 2016, Corrections enacted DAI Policy 300.00.78 and Records Office Procedure E-04 to address legal name changes. Pursuant to DAI Policy 300.00.78, an inmate's "DAI inmate name" (i.e., their JOC name) and DOC

number "shall accompany the new legal name for mail, visits, notary, and financial and business purposes." DAI Policy 300.00.78 Section IV.B. Pursuant to Records Office Procedure E-04, "If the Court Order does not direct the DOC to change their records and only allows the inmate to utilize the changed name, record the changed name and/or DOB in WICS as an alias in the Personal Characteristics screen."[4]

### 2.3 Plaintiff's Claims

Plaintiff's claims involve instances at WCI, New Lisbon Correctional Institution ("NLCI"), and WSPF in which Defendants declined to process internal correspondences or provide notary services based on Plaintiff not including his JOC name on his requests. The claims span from December 2017 through April 4, 2018.

#### 2.3.1 WSPF

Plaintiff's two claims arising out of WSPF relate to Defendants refusing to process internal correspondences because Plaintiff had not included his JOC name. First, at WSPF, on December 1, 2017, Defendant Buss returned a piece of internal correspondence to Plaintiff. Buss wrote to Plaintiff, "Please note correspondence must contain your incarcerated name." The correspondence had included only the name Tayr Kaleeb al Ghashiyah. Second, on December 18, 2017, Defendant Kartman declined to process an internal correspondence, writing, "Prior direction provided from 2007. You are required to use your incarcerated name for internal correspondence." Again, the correspondence from Plaintiff had included only the name Tayr Kaleeb al Ghashiyah.

_____

[4]The Court notes there is no end quotation in DPFF. _See_ ECF No. 51 at 4-5. The Court presumes this is the correct quotation; regardless, the exact language is immaterial for the purposes of summary judgment.

### 2.3.2   NLCI

On January 19, 2018, Plaintiff was transferred from WSPF to NLCI. The NLCI claims relate to Plaintiff's denial of notary services and his subsequent complaints not being processed. On February 9, 2018, Defendant Washetas came to Plaintiff's cell front to provide him notary service. Plaintiff had written only the name Tayr Kaleeb al Ghashiyah on the copies he wanted Washetas to notarize. Washetas questioned him about his legal name. Plaintiff provided Washetas with a copy of the April 18, 2005 memorandum which stated he could use only his legal name for notary services. Washetas left to speak to someone, and then came back and informed Plaintiff she would not provide notary services.

On February 11, 2018, Plaintiff submitted an inmate complaint about being denied notary services. He asked for Washetas to be terminated for misconduct and to be paid $5 million in damages. On February 12, 2018, Inmate Complaint Examiner Beloungy returned Plaintiff's grievance related to the notary issue. In the letter explaining the reason for the return, Beloungy wrote:

> The submission received on 02/12/2018 is not accepted.
>
> -Before this complaint is accepted, you need to attempt to resolve the issue by contacting DW Thomas [DOC 310.09(4)].
>
> -Other, see comments below.
>
> -The ICE is also directing you to provide this office with written documentation of your attempts to resolve the issue as directed. Written documentation means responses to interview requests and other written responses from the staff contacted.
>
> This is a return, not a rejection, and you have the opportunity to fix identified errors. You may resubmit your complaint

after you have completed the following and/or above instructions.

#1 Prior to resubmitting complaint and in an attempt to resolve this issue by following the appropriate chain of command, the ICE is directing you, if you have not already, to contact the above mentioned staff member, as he oversees the Program Director. Please inform him that you were instructed to contact him by the Inmate Complaint Department regarding the issue presented in this submission. If you do not gain resolution, you may resubmit your complaint.

#2 If you choose to resubmit we request that you include any documentation/correspondence you have or receive concerning this issue, including from the above mentioned staff.

Plaintiff wrote to Beloungy on February 13, 2018, stating:

Don't understand what part of complaint that you did not understand that the undersigned contacted Records office, Business office and Library and got the run around. See their request and return exhibits [indecipherable].

Then the First Shift Sgt and Capt of Seg resolved the issue by obtaining Ms. Washetas to do "notary" and she refused too!

Now you're trying to make us jump through some unnecessary hoop after we tried to get notary.

Ms. Kenney never got back to us. Warden did not respond either.

On February 15, 2018, ICE Fredlund responded to Plaintiff's letter to Beloungy to inform him his submission (the February 13, 2018 letter) was not accepted. She explained:

-Complaints must be typed or written legibly on forms supplied for that purpose [DOC 310.09(1)(a)].

-Before the complaint is accepted, you need to attempt to resolve the issue by contacting Education Director Ms.

Kennedy (in charge of Lib.) DW Mr. Thomas, (Ed. Dir. Supervisor) [DOC 310.09(4)].

-Other, see comments below.

-The ICE is also directing you to provide this office with written documentation of your attempts to resolve the issue as directed. Written documentation means responses to interview requests and other written responses from the staff contacted.

This is a return, not a rejection, and you have the opportunity to fix identified errors. You may resubmit your complaint after you have completed the following and/or above instructions.

1) You state that you have contacted Ms. Kennedy if so when? If you haven't please do so and submit the documentation.

2) Inmates writing to staff must follow the chain of command. All levels must be exhausted before writing to the Warden or filing a complaint. Issues of this nature should be dealt with the Library which is supervised by the Education Director. If after contacting your Ms. Kennedy and discussing the issue and you are not satisfied with the response, the Deputy Warden is the direct supervisor for her the Education Director.

3) As stated above your complaint must be legible which includes your signature, please sign it legibly if you wish to resubmit after contacting the above staff.

Plaintiff re-submitted his same complaint. On February 15, 2018, Fredlund returned the complaint, with a letter explaining why. She wrote:

-Complaints must be typed or written legibly on forms supplied for that purpose [DOC 310.09(1)(a)].

-Before this complaint is accepted, you need to attempt to resolve the issue by contacting Dep. Warden Thomas [DOC 310.09(4)].

-Other, see comments below.

-Your attempted filing is being returned to you a second time for the reason(s) cited in the ICE return letter previously sent to you. If you again attempt to file without following the direction(s) in that letter, this office will not respond and your submissions will not be returned to you.

This is your second return not a rejection, on 2/12/18 ICE-PA Ms. Beloungy returned your complaint stating you needed to contact the DW. per policy you must give them time to respond to your kite which is 5 business days.

1) All complaint materials must be on a complaint form not written on other DOC-Forms or receipts for these documents are scanned into your record. So if you choose to resubmit please place page 2 on a DOC-400 form.

2) As it states above your complaint must be legible including your signature, please make sure that your signature is legible upon resubmission.

### 2.3.3 WCI

On March 26, 2018, Plaintiff transferred to WCI. On March 28, 2018, Plaintiff submitted three requests for legal loans to the business office. The next day, Plaintiff submitted a Disbursement Request seeking postage for Case 2017-AP-2209. Plaintiff did not include his JOC name on any of the requests. On March 30, 2018, Defendant Jackson denied the three legal loan requests. That same day, Jackson also denied the disbursement request. Jackson wrote as the reason for denial of the disbursement request: "No case approved / name provided not allowed."

On March 29 and March 30, 2018, Plaintiff sent requests to the library to E-file some items. His requests did not include his JOC name. Defendant Webster declined to process the requests. In response to the March 29, 2018 request, Webster wrote, "Please resubmit your DOC-643 properly completed including your DOC name and no toothpaste." In response to

the March 30, 2018 request, Webster wrote, "I do not find anyone named "Tayr Kilaab al Ghashiyah on the WCI/DOC locator. Please use your appropriate DOC name. Thank you." Plaintiff responded to Webster on March 30, 2018, writing:

> Your office is completely aware of case 2007-3670 from 7th Circuit and Pamela Knick memorandum with regards to use of legal name of Tayr Kilaab al Ghashiyah and any further abuse of your office will be addressed to courts and attorney general because your office is primes example that DOC misled the courts.[5]

Webster responded on April 2, 2018, writing:

> 1.Your assessment above of the library's 'complete awareness' on this matter is unfortunately inaccurate. 2. I do not find anyone named 'Tayr Kilaab al Ghashiyah' listed on the WCI/DOC locator. Please use your appropriate DOC name on your requests submitted to the library, including the additional two requests that accompany this response. Thank you.

On April 1, 2018, Plaintiff submitted three more requests for a legal loan, none of which included his JOC name. Jackson denied each of the requests, noting, "Incomplete Form. May not use name provided." On April 3, 2018, Jackson responded to a note from Plaintiff, informing him, "When filling out legal loan applications or using legal loan funds, you must include John Casteel. You may write both names or only John Casteel." On April 2, 2018, Reisen returned correspondence to Plaintiff because Plaintiff had not used his JOC name. She wrote, "Your

---

[5]The Court notes there is no end quotation in DPFF. *See* ECF No. 51 at 10. The Court presumes this is the correct quotation; regardless, the exact language is immaterial for the purposes of summary judgment.

correspondence is being returned to you since you failed to use your DAI Inmate name per information received from the Records Office."

On April 3, 2018, Gyr denied notary services to Plaintiff, stating, "I cannot read your DOC # nor find you in the system under that name. Please resubmit with a legible DOC # & your correct name for DOC." On April 4, 2018, Reisen returned Plaintiff's correspondence to the warden's office by stating, "Your correspondence is being returned to you since you failed to use your DAI inmate name per information received form the records office."

### 2.4 Rationale for Dual Name Policy

Allowing inmates to use only their newly changed names on internal correspondences would seriously impede DOC's ability to easily identify and control the population. With approximately 20,000 inmates currently incarcerated, staff rely on the ability to identify inmates quickly, particularly those inmates who are at risk for escape or who present risks based on the violent nature of their offense(s), vulnerability, gang affiliation, or otherwise. That recognition becomes increasingly difficult given the number of different inmates staff encounter on a daily basis, and becomes even more difficult when inmates start to change their names.

Administratively, every inmate has numerous records relating to them electronically and in hard copy form, including but not limited to: (1) visiting lists; (2) cell search cards; (3) property lists and inventories; (4) ID cards; (5) social services files; (6) legal files; (7) cell hall warning cards; (8) job evaluations; (9) security threat group files; (10) high risk assessments; (11) psychological services files; (12) health services files; (13) security files; (14) probation/parole files; (15) education files; (16) social worker files; (17) unit files; (18) property files; and (19) business office files

(financial transactions). This list is not exhaustive, and there are numerous other records kept for individual inmates. There are also several computer databases used by Corrections, such as Wisconsin Integrated Corrections System ("WICS"), ("WITS"), the Inmate Complaint Tracking System "(ICTS"), and COMPAS, in which the inmate's name would have to be changed by each system's administrator(s). In addition, if an inmate is responsible for paying child support or restitution, those agencies would also need to be contacted to alert them of the name change.

It is not administratively feasible for Corrections staff to change all of the records listed above whenever an inmate desires a name change. It would require an enormous amount of staff time and resources, which are already pressed very thin.

### 2.5 Plaintiff's Practice of Islam in Prison

Plaintiff testified that when he was in prison, he would practice his religion by saying his prayers five times a day, observing Ramadan, reading the holy Quran and related books, and "just [having] good mannerisms every day." He testified that he did those things "Most of the time."

## 3. ANALYSIS

Defendants' motion for summary judgment seeks dismissal of all claims, namely the First Amendment free exercise claim, Fourteenth Amendment due process claim, and the access to the courts claim. ECF Nos. 50 at 12. Based on the Court's review of the parties' submissions, and for the reasons explained below, the Court will grant Defendants' motion for summary judgment in full and will dismiss this case.

### 3.1 First Amendment Free Exercise Claims

Plaintiff claims that DOC's enforcement of its dual name policy violated his First Amendment free exercise rights. Plaintiff maintains that

he should have been permitted to use only his religious (and legally changed) name, Tayr Kilaab al Ghashiyah Khan on his correspondence. Defendants argue that their dual name policy, requiring Plaintiff to use John Casteel, his JOC name, in addition to his religious name, does not violate the First Amendment.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Incarcerated persons "clearly retain protections afforded by the First Amendment," including a limited right to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (quotation omitted); *Tarpley v. Allen County*, 312 F.3d 895, 898 (7th Cir. 2002). To proceed under the Free Exercise Clause, the plaintiff must show that prison officials "intentionally and substantially interfere[d] with [his] ability to practice his faith" and that the prison's restriction was not "reasonably related to a legitimate penological interest." *Garner v. Muenchow*, 715 F. App'x 533, 536 (7th Cir. 2017) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Plaintiff's free exercise claim fails at the outset because he has presented no evidence that the name policy was targeted against Muslims. Under a First Amendment claim, "plaintiffs carry the additional burden of showing that the law is targeted against a religion or religious practice." *Aiello v. West*, 207 F. Supp. 3d 886, 897 (W.D. Wis. 2016) (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S. Ct. 2217, 124 L.Ed.2d 472 (1993) ("[A] law that is neutral and of generally applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.")); *see also Ali v. Wingert,* 569 F. App'x 562, 565 (10th Cir. 2014)

("[B]ecause Mr. Ali hasn't alleged that the prison's policy is anything but neutral toward religion and generally applicable, we don't see how his religious liberty argument might fare any better under the First Amendment's free exercise guarantee than it does under RLUIPA."). Nothing in the record shows that the policy was put into place to target Muslims or that the DOC applied the policy differently depending on a person's religion. Because Plaintiff presents no evidence to the contrary, the free exercise claim fails for that reason alone.

Second, Plaintiff has not shown that the name policy substantially burdened his religion. The Seventh Circuit has described a substantial burden as "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (discussing substantial burden in the context of RLUIPA's broad definition). Here, Plaintiff has shown no evidence that using his JOC name in addition to his religious placed *any* burden on his religious beliefs much less a substantial burden. Plaintiff testified that taking a new name was "recommended" in his religion but that it was "not required." DPFF 5. Nothing in the record suggests that including Plaintiff's JOC name on paperwork in addition to his religious name went against any religious belief. As such, the Court finds that the record does not support a finding that the dual name policy imposed a substantial burden on Plaintiff's religion. *See Ali*, 569 F. App'x at 565 ("Federal courts certainly are not arbiters of religious scripture or dogma, but to establish a RLUIPA claim they do require from the claimant some *well-pleaded facts* suggesting a substantial burden on a sincere religious exercise.").

Finally, Plaintiff's free exercise claim fails because the undisputed evidence shows that the DOC's dual name policy is related to a legitimate penological interest. Legitimate penological interests include security and economic concerns. *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009). When prison officials assert such a concern to justify the curtailment of an inmate's religious exercise, courts consider four factors in determining whether the challenged restriction is constitutional: (1) whether the restriction "is rationally related to a legitimate and neutral governmental objective"; (2) "whether there are alternative means of exercising the right that remain open to the inmate"; (3) "what impact an accommodation of the asserted right will have on guards and other inmates"; and (4) "whether there are obvious alternatives to the [restriction] that show that it is an exaggerated response to [penological] concerns." *Lindell v. Frank,* 377 F.3d 655, 657 (7th Cir.2004) (citing *Turner,* 482 U.S. at 89–91, 107 S. Ct. 2254).

Defendants argue the first factor weighs heavily in their favor because a rational connection exists between the institution's dual name policy and the legitimate government interest in prison administration. This Court agrees. Defendants maintain that allowing inmates to use only their newly changed names on internal correspondences would seriously impede DOC's ability to easily identify and control the inmate population. With approximately 20,000 inmates currently incarcerated, staff rely on the ability to identify inmates quickly, particularly those inmates who are at risk for escape or who present risks based on the violent nature of their offense(s), vulnerability, gang affiliation, or otherwise. Defendants maintain that recognition becomes increasingly difficult given the number of different inmates staff encounter on a daily basis and becomes even more difficult when inmates start to change their names.

Defendants identify numerous records that every inmate has both electronically and in hard copy form, including but not limited to: (1) visiting lists; (2) cell search cards; (3) property lists and inventories; (4) ID cards; (5) social services files; (6) legal files; (7) cell hall warning cards; (8) job evaluations; (9) security threat group files; (10) high risk assessments; (11) psychological services files; (12) health services files; (13) security files; (14) probation/parole files; (15) education files; (16) social worker files; (17) unit files; (18) property files; and (19) business office files (financial transactions). Defendants provide that this list is not exhaustive, and there are numerous other records kept for individual inmates. There are also several computer databases used by Corrections, such as WICS, the ICTS, and COMPAS, in which the inmate's name would have to be changed by each system's administrator(s). In addition, if an inmate is responsible for paying child support or restitution, those agencies would also need to be contacted to alert them of the name change.

Defendants maintain that it is not administratively feasible for staff to change all the records whenever an inmate desires a name change. Plaintiff does not provide any response to this line of argument. Defendants present a rational explanation that changing a prisoner's name in all these locations is not economically feasible. As such, the Court finds that the first factor weighs in favor of Defendants.

As to the second factor, little exists in the record regarding Plaintiff's alternative means to practice his religion. Plaintiff testified that he would say his prayers five times a day, observe Ramadan, read the holy Quran and related books, and "just [have] good mannerisms every day." DPFF 43. Although Plaintiff had to use his JOC name on documents, the dual name

policy also allowed him to use his religious name on all papers. Thus, the Court finds the second factor weighs slightly in favor of Defendants.

As to the third factor, Defendants have provided ample evidence that allowing an inmate to use a different name other than his JOC name would have a negative impact on the allocation of prison resources. The Court is well aware that the Wisconsin DOC has faced significant staffing issues in certain areas. The allocation of scarce prison resources is a significant issue that the DOC is best suited to handle in instances such as these. As such, the Court finds that the third factor weighs in favor of Defendants.

Finally, the Court agrees with Defendants that there are no obvious or easy alternatives to the current policy. The policy of allowing inmates to use dual names on internal documents appears to be the happy medium between respecting religious beliefs and the efficient administration of the prison system. As such, the Court finds that the last factor weighs in favor of Defendants.

In sum, the undisputed evidence does not show that Defendants intentionally and substantially interfered with Plaintiff's ability to practice his faith. Regardless, the Court also finds that the prison's dual name policy was reasonably related to a legitimate penological interest. As such, the Court will accordingly grant Defendants' motion for summary judgment as to the free exercise claim.

### 3.2    Due Process — Return of Inmate Complaints

Next, Defendants argue that any due process claim for the return of Plaintiff's inmate complaint must be dismissed. Defendants first argue that there is no factual basis for Plaintiff's claim; the Court agrees with respect to Defendants Beloungy and Fredlund. Plaintiff claims that Beloungy and

Fredlund intentionally failed to process his inmate grievances because he used his religious name only on the filings. *See* ECF No. 1-1 ¶¶ 144, 145. The undisputed evidence, however, shows that Beloungy returned a grievance on February 12, 2018, because Plaintiff had not first attempted to resolve the issue by following the appropriate chain of command. DPFF 22. Plaintiff responded with a letter and resubmitted his complaint. DPFF 23, 25. In response, Fredlund returned the complaint and explained that it was being returned for three reasons: (1) Plaintiff had to contact the Deputy Warden first and give them five business days to respond; (2) page two needed to be placed on a DOC-400 form; and (3) Plaintiff's signature had to be legible. DPFF 26. As such, the undisputed evidence does not support Plaintiff's allegations that these grievances were not filed for Plaintiff's use of his religious name.

Defendants do not address the factual basis for Plaintiff's claim against Defendant Reisen. Plaintiff's complaint alleges that on April 2, 2018, Reisen declined to process formal grievance forms to the warden's office because Plaintiff did not use his DAI inmate name ECF No. 1-1 ¶ 159. The evidence in regard to this allegation is unclear and the Court is unable to determine that no factual basis exists for this claim. Nonetheless, the Court will grant summary judgment on this claim because it agrees with Defendants' contention that grievance procedures do not create liberty interests protected by the Due Process Clause. The Seventh Circuit has found that prison grievance procedures are not mandated by the First Amendment and do not by their very existence create interests protected by the due process clause. *Owens v. Hinsley*, 635 F.3d 950, 953–54 (7th Cir. 2011); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007); *Grieveson v. Anderson*, 538 F.3d 763, 772 & n. 3 (7th Cir. 2008)."[A]ny right to a grievance procedure

is a procedural right, not a substantive one." *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). "Accordingly, a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause." *Id; see also Walton v. Waltz*, No. 23-2486, 2024 WL 688090, at *2 (7th Cir. Feb. 20, 2024) ("Nor can he state a due process claim regarding the prison officials' purported mishandling of his grievance, given that a state's grievance procedure confers no liberty interest on a prisoner."). As such, the Court does not find that Plaintiff's allegations regarding the mishandling of his inmate complaints rises to the level of a due process violation. The Court accordingly grants Defendants' motion for summary judgment on this claim.

### 3.3 Access to Court

Plaintiff generally alleges that Defendants prevented him access to the court by not allowing him to use only his religious name on certain documents. The Constitution guarantees prisoners a right of access to the courts. *Lewis v. Casey*, 518 U.S. 343, 350–51 (1996). But because that right is to access the *courts* rather than legal materials or law libraries, an inmate will not have a valid claim unless the prison authorities' conduct prejudiced a potentially meritorious challenge to his conviction, sentence, or conditions of confinement. *Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir. 2009); *Bridges v. Gilbert*, 557 F.3d 541, 553 (7th Cir. 2009); *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006).

The point of recognizing an access to the courts claim "is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002). The constitutional right of access to court "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut

out of court." *Id.* at 415; *see also Lewis,* 518 U.S. at 353 (plaintiff must identify a "nonfrivolous," "arguable" underlying claim). Accordingly, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Harbury,* 536 U.S. at 415.

Here, Plaintiff's claim fails at the outset because it does not meet the basic requirements for an access to courts claim. Although Plaintiff generally references that he was denied access to courts, he does not provide any specific information about how Defendants' actions actually prejudiced a potentially meritorious claim. Plaintiff's affidavit contains references to needed legal materials, such as "legal documents for purpose of physical evidence for civil action" and a copy of "Habeas Corpus for Federal Courts," *see* ECF No. 55 at 14-15; however, none of these references are made in reference to any specific case. Further, no evidence suggests that Plaintiff was pursuing a nonfrivolous claim in any of these instances. As such, the Court therefore grants Defendants' motion for summary judgment as to Plaintiff's access to courts claim.

**4.      CONCLUSION[6]**

For the reasons explained above, any claims against the Doe defendants are dismissed without prejudice for Plaintiff's failure to comply with the Court's order. Additionally, the Court grants Defendants' motion for summary judgment and will accordingly dismiss this action. The Court

---

[6]Defendants also moved for summary judgment based on qualified immunity. ECF. No. 50 at 20. Because the Court grants summary judgment on the merits and based on the undisputed facts, the Court need not reach the question of qualified immunity.

has carefully reviewed the record and finds that Defendants are entitled to judgment as a matter of law on all remaining claims.

Accordingly,

**IT IS ORDERED** that all claims against the Doe defendants be and the same are hereby **DISMISSED without prejudice** for Plaintiff's failure to comply with the Court's order;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment, ECF No. 49, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's First Amendment free exercise claim, Fourteenth Amendment due process claim, and access to the courts claim be and the same are hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of November, 2024.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.